C. F. STARLIPER *v.* S. H. GRAY *et al.*

(*Knoxville.*   September Term, 1916.)

SPECIFIC PERFORMANCE.   Time of performance.   Abandonment of right.

Where contracts for the purchase of corporation stock of several persons were not completely executed within the time limit because of failure·of the purchasers to perform their part, a seller was entitled to specific performance, having performed his part of the agreement, notwithstanding other sellers under the same contract, becoming alarmed at the purchaser's delay, sold at' less than the contract price.

FROM WASHINGTON.

Appeal from the Chancery Court of Washington County.—C. J. ST. JOHN, Special Chancellor.

J. STANLEY BARLOW, for appellant.

THAD A. COX and BEN H. TAYLOR, for appellees.

MR. CHIEF JUSTICE NEIL, delivered the opinion of the Court.

. This bill was filed for the purpose of obtaining a specific performance of a contract entered into between complainant and others with defendant Gray and one W. S. Smith, to buy certain stock in the Johnson City Lumber & Manufacturing Company.

The controversy arose out of the following facts:

Some time prior to the occurrences which are the subject of the present controversy the lumber company had received a deed from the Holston Company for a lot on which its buildings were erected. This deed was made with the aid of the Chamber of Commerce of Johnson City. In order to forward the transaction, and advance the interests of Johnson City, the Chamber of Commerce paid to the Holston Company $1250, and in that way the lot was secured. The deed which was made by the Holston Company to the lumber company, however, contained certain conditions, one of which was that the business should be conducted upon the lot for ten years, and that a certain number of employees should be operated, and other points not necessary to specially mention.

The building was constructed and the business conducted harmoniously, and apparently with reasonable profit, and indeed with growing success, until about the time the present controversy arose, when, owing to the increasing scope of the enterprise, the need of additional capital was felt, and, in order to obtain this capital, the books were opened for additional subscriptions, and the defendant Gray, along with others, took stock. Mr. Gray, so it seems, was a man of some means and very tenacious, and very careful in the furtherance of his own business interests. He also had become bound for the company in the sum of about $5,000. Mr. S. E. Miller, another stockholder, was bound for about $15,000, but had

a mortgage on the property for $10,000. A contract was given to Mr. Gray for the buying of logs, which many of the stockholders deemed to be unfair to the company, and this caused dissension. An effort was made, or was in contemplation, so to speak, to set aside Mr. Gray's very favorable contract, and he regarded this as very hurtful to his interests. So it gradually developed that a conflict of interests grew up between Gray and the other stockholders, except Smith; the latter siding with Mr. Gray. The struggle was to obtain the majority of the stock. Starliper belonged to the faction which was opposed to Gray, and he purchased the stock of one Whitsant for $800. This gave his faction the control. However, Gray and Smith contended that the purchase was illegal, and so the conflict continued. In this unsettled condition of the business every one recognized that the corporation was likely to suffer. Starliper's faction insists that Gray and Smith were threatening to put the business in the hands of a receiver. Gray and Smith deny this, but say that they simply said, in substance, that the way things were going along, considering the dissension among the stockholders, the business would soon land in the hands of a receiver, or must soon land there, in the natural course of events.

In order to cure this condition, Gray and Smith offered to buy the stock of all the others at eighty-five cents on the dollar. The contract was in writing, and was in the following words:

"This agreement made and entered into by and between S. H. Gray and W. S. Smith, parties of the first part, and T. B. Wallace, E. C. Wallin, Edgar Wallin, S. E. Miller, and Frank Starliper, parties of the second part, witnesseth: "That the parties of the first part do hereby agree to purchase the stock of the parties of the second part in the Johnson City Lumber & Manufacturing Company, said stock being as follows:

"T. B. Wallace and E. C. Wallin, sixty shares, $6,000; Edgar Wallin, seventeen shares, $1,700; S. E. Miller, twenty shares, $2,000; Frank Starliper twenty-two and one-half shares, $2,250—and pay for the same eighty-five cents on the dollar, one-half of which will be paid in cash; and the balance in six and twelve months from date hereof, the deferred payments to be evidenced by our joint and several notes, and to be secured by said stock so purchased, which will be attached to said notes as collateral security.

"It is agreed, however, that the ten shares of stock of S. E. Miller will be paid for outright at par by the cancellation of two notes given by S. E. Miller to the Johnson City Lumber & Manufacturing Company in payment for said ten shares of stock, and the remaining ten shares will be paid for as above stated at the rate of eighty-five cents on the dollar; all other notes of said company on which S. E. Miller is indorser will be taken up and paid, or renewed without his endorsement.

"It is stipulated that the parties of the first part will cause to canceled the note of Frank Starliper for the sum of eight hundred dollars given in payment for eight shares of stock in the Johnson City Lumber & Manufacturing Company on surrender by him of the certificate of stock given therefor properly endorsed.

"This agreement this day executed by the parties of the first part and by S. E. Miller, one of the parties of the second part, and is to become effective and binding on all the parties if signed by all the parties, and on condition of the release of the incumbrances in deed from Holston corporation to the Johnson City Lumber & Manufacturing Company being procured by properly executed deed within ten days from this date.

"It is understood and agreed that the parties of the second part, upon the execution of this agreement within ten days as above stated, will tender their resignation as directors and officers of the Johnson City Lumber & Manufacturing Company, and the same to become effective at once.

"In testimony whereof we have hereunto affixed our signatures on this 8th day of March, 1916.

> "[Signed.] S. H. GRAY,
> "W. S. SMITH,
> "Parties of the First Part.

"T. B. WALLACE,

"S. E. MILLER,

"E. C. WALLIN,

"EDGAR WALLIN,

"C. F. STARLIPER,

"Parties of the Second Part."

A companion contract to this was as follows:

"This agreement by and between S. H. Gray and W. S. Smith, parties of the first part, and S. E. Miller, party of the second part, witnesseth:

"That the party of the second part, S. E. Miller, agrees to cause to be released to the Johnson City Lumber & Manufacturing Company, a corporation, the conditions and incumbrances made and contained in the deed from the Holston Corporation to the Johnson City Lumber & Manufacturing Company, so as to vest in the company an unencumbered title, so far as said conditions are concerned, and in consideration thereof parties of the first part agree to pay to said S. E. Miller, so soon as said conditions can be released, the sum of $500, and S. E. Miller agrees on his part to have said conditions released and fully discharged without any further or other costs to the Johnson City Lumber & Manufacturing Company.

"The company, through the parties of the first part, agrees to furnish party of the second part all statements and data of business done to date for the use of the Holston Corporation and Chamber of Commerce, and to assist in every way when called upon

to have said conditions released at the least possible sum, but said sum of $500, will be paid to S. E. Miller, whatever he may have to pay said Holston Corporation or Chamber of Commerce.

"It is understood however, that the agreement to pay said sum of $500 is conditioned upon the execution of another contract of even date herewith between the parties of the first part and S. E. Miller and associates for the purchase of their stock in the Johnson City Lumber & Manufacturing Company.

"In testimony whereof witness the signatures of the parties to this instrument on this March 8, 1916.

                    "[Signed.] S. H. GRAY,
                         "W. S. SMITH,
                    "Parties of the First Part.
                         "S. E. MILLER,
                    "Party of the Second Part."

An addition or modification of this contract was entered on March 10, 1916, as follows:

"The parties of the first part agree to a modification of the above agreement to the extent of agreeing to pay to S. E. Miller said sum of $500 (five hundred), and on condition that the Chamber of Commerce shall agree to take a bond in the penalty of $1,250 to guarantee the operation of the plant for the period of five years on the terms and conditions set out in deed of April 27, 1915, the parties of the first part agree that such a bond will be given and

the party of the second part will not be required to procure the release of the conditions and restrictions in said deed except on terms of said bond being given, and the agreement of the Chamber of Commerce to take said bond and release the Holston Corporation shall be taken and treated as a compliance with the agreement of party of the second part hereto. But said Chamber of Commerce shall on the execution of said bond release all claims for reimbursement.

"This March 10, 1916.

"[Signed] S. H. GRAY.

"W. S. SMITH."

Gray and Smith did not execute the bond which they were required to execute under the contract of March 10th, although the Chamber of Commerce agreed to accept Mr. Gray's own bond. He testifies that he did not give it simply because he did not wish to.

In the meantime, before the expiration of the ten days mentioned in the contract of March 8th, a deed had been sent forward to the chief office of the Holston Company in New York, but it was not returned until after the ten days had expired. It seems that it had to pass the scrutiny of its local attorney in Johnson City, and also the authorities of the company in New York. But, as stated, the bond had not been given by Gray and Smith, and so there was no obligation on the part of the Chamber of Commerce

to further the matter. The Chamber of Commerce was the real party in interest, because it had paid the $1,250 originally, and the Holston Company would not agree to make the deed of release except with the consent of the said Chamber of Commerce of Johnson City. So the ten days expired without the execution of the deed. After the expiration of that time Gray and Smith refused to have anything further to do with the matter. There is a controversy as to whether they refused to go forward with the deal before the expiration of the ten days. S. E. Miller, one of the leading men in the corporation, and Mr. Wallin, testify that Gray evaded them so that they could not get sight of him, dodged into stores, and in other ways escaped them, and that they were informed by Mr. Smith that Gray was going to "back out" because he could not get the money cheaply enough, and that he himself could not go forward unless Gray went with him. Smith in his evidence, practically admits this fact. Gray denies that he evaded these stockholders. However, we think the weight of the proof shows that the last three or four days of the ten days Gray and Smith were wavering and were giving it out that they could not go forward with the purchase; but about four o'clock on the last day they suddenly became bold and said that they would carry out their contract and purchase the stock, but that they must have this deed of release from the Holston Company first, and when Miller and Wallin offered them some papers showing that it

was only a matter of a few days when the deed could be produced, they said that they were ready "right now" to carry out the contract if the deed should be delivered to them, but that they would not, after the expiration of the ten days, take the stock. This was, as stated, at four o'clock on the last day, when they knew that it was impossible to procure the deed within the ten days.

After the expiration of the ten days, about the 27th of March, the Holston Company executed the deed.

The stockholders who had agreed to sell the stock at eighty-five cents—that is, Starliper, S. E. Miller, Wallin, and others—were confronted with the following situation: Gray and Smith had refused to buy the stock. To compel them to take it a litigation would have to be inaugurated. This meant a continuation of the previous dissension in a more aggravated form, with constant deterioration of business, and necessarily with great loss to all, or nearly all, the stockholders. The situation was acutely felt by Mr. Miller, because he was the leading financial spirit in the enterprise, and was bound for more of the debts of the corporation than anybody else; that is, as already stated, for $15,000.

In this suitation all of the stockholders on that side of the controversy, except Starliper, felt they must make some concessions. So Miller remained in the company, and all of the others agreed, except Starliper, to take seventy-five cents for their stock, and this new contract was carried out. Starliper

refused, and filed his bill to compel a specific execution of the contract to take his stock at eighty-five cents on the dollar. The defendants resisted this demand, on the ground that when the ten days expired their obligation ceased. They claimed that the ten days' time was of the essence of the contract. They further say that in order to obtain the release deed of the Holston Company they had to pay the Chamber of Commerce of Johnson City $500 in cash.

In respect of this latter feature the record shows that the Chamber of Commerce was perfectly willing to receive the bond provided for in the modified contract of March 10, 1916, but that Gray and Smith finally refused to give that bond, and preferred to pay $500, and did so.

It is the insistence of Gray and Smith that they were not to pay anything except the $500 fee to S. E. Miller; that in consideration of paying this to Miller he was to get the consent of the Chamber of Commerce to the release, which was to be made by the Holston Company. In singular contrast to this contention is the modified contract of March 10th, under which they agreed, without any kind of protest at the time, to execute a bond for $1,250 in order to procure the release. Really it is very clear from the contract which was made between them and Miller on the 8th of March, 1916, that it was plainly understood they would have to pay the Holston Corporation something, or the Chamber of Commerce, in addition; that is what might be paid to Miller

Starliper v. Gray.

would not satisfy, or might not satisfy, the Holston Corporation, or the Chamber of Commerce. This is clear from one paragraph in the contract just referred to, viz.:

"The company, through the parties of the first part, agrees to furnish party of the second part all statements and data of business down to date for the use of the Holston Corporation and Chamber of Commerce, and to assist in every way when called upon to have said conditions released *at the least possible sum*, but the sum of $500 will be paid to S. E. Miller *whatever he may have to pay said Holston Corporation or Chamber of Commerce*."

This could mean nothing else than that it was ununderstood that something would have to be paid to the Holston Corporation or the Chamber of Commerce in order to get the release. In the light of the language italicized we can see how perfectly reasonable it was that Gray and Smith on the 10th of March agreed to execute the bond for $1,250. If it ever had been understood that Miller's $500 fee was to eventuate in the securement of the release without the payment of any consideration to the Chamber of Commerce, or to the Holston Corporation, Gray and Smith would never have agreed to make the bond. But if we are wrong about this, at all events they agreed to give the bond; and it thus devolved on them as a condition precedent to the release·to execute the bond or to make satisfaction to the Chamber of Commerce in respect thereof.

As it turned out, they not only paid the fee of Miller, but in lieu of the bond paid $500 to the Chamber of Commerce.

So the result of the matter was that Gray and Smith obtained all they desired to obtain within a month or such a matter, but at less cost than they anticipated. They got the release they wished. They got rid of all of the other stockholders except Miller by paying them ten cents less on the dollar than they had agreed to pay  except Starliper, and against the latter's will they retained him, as Mr. Gray said, because they needed his work, he being a sawyer, just a workman in their service. They willingly retained Miller, a valuable man, as they had now the majority of the stock, and he could not thwart them.

Starliper, however, was not willing to have his rights thus disposed of. He insists upon having the contract performed. The question is: Is he entitled to this relief?

We think that he is so entitled.

Regardless of the question of construction as to whether the ten days' time limit was of the essence of the contract, it is perfectly clear that when Gray and Smith agreed to the modification of March 10th, under which they were to execute the bond, the duty rested on them after that to make the first move; that is, to execute the bond, or to pay such a sum of money as they and the Chamber of Commerce could agree on in lieu of the bond. During their inaction the time limit was automatically extended. It never be-

came incumbent upon the Chamber of Commerce to authorize the delivery of the deed of release by the Holston Company until it, the Chamber of Commerce, should be satisfied by the bond, or by some commutation of it. This was finally arranged some time in March, when the $500 was paid by Gray and Smith, and the deed was received. When this deed was received, it became their duty to pay to Mr. Starliper the amount due for his stock.

His rights are not at all compromised by the fact that other stockholders took fright and settled with Gray and Smith at seventy-five cents on the dollar, and that Miller stayed in. Starliper had the right to stand fast as he has done, and to claim his dues.

It is insisted that, because at a meeting of the stockholders about the 1st of April, 1916, Starliper seconded certain motions, he is thereby estopped. There is nothing in this. He never agreed to settle with Gray and Smith, or to give up his rights, and they were in nowise injured, nor was he benefited by the seconding of the motions. Indeed, it was merely a formal matter and done by him at the request of the acting secretary at that time, Mr. Miller, as a matter of form in order to show some variety of action in the motions and seconds; there being only a very few stockholders present at the meeting.

It it insisted that Starliper accepted the *status* because, when Mr. Miller agreed to remain and other persons, except Starliper, took seventy-five cents for their stock, Miller offered Starliper's stock to Gray

and Smith at seventy-five cents on the dollar, which they refused. Both Miller and Starliper say that this was done without Starliper's authority, and there is no proof to the contrary.

A good deal is said in the briefs about the Whitsant $800 of stock. It was a part of the agreement, as appears from one of the writings above set out, that Gray and Smith were to relieve Starliper of this stock. This they subsequently did. Whether they did so pursuant to the contract, or otherwise, is not material. That was a mere incident of the contract. The real subject of the contract, as far as Gray and Smith and Starliper were concerned, was that they were to buy Starliper's stock at eighty-five cents on the dollar, outside of the $800 of his Whitsant stock, which had been acquired by him in the manner previously stated, and about his ownership of which there had been some controversy.

Complainant, Starliper, is entitled to a decree against Gray and Smith compelling them to take his stock at eighty-five cents on the dollar. The decree of the chancellor will therefore be reversed, and the cause remanded to the chancery court at Johnson City, with directions to the chancellor to enter a decree in Starliper's favor against Gray and Smith for one-half the par value of the stock at the rate of eighty-five cents on the dollar, with interest from March 27, 1916. Under the terms of the contract the remaining half of the one-half was to be paid at six

months from its date, which, under the postponed period indicated, would be September 27, 1916, which has already passed. The chancellor will enter a decree against Gray and Smith for this sum. The remaining half of the sum left, after deducting the cash payment called for, will fall due twelve months from March 27, 1916, which will be March 27, 1917. The chancellor will retain the cause in court until that date, and if the money shall not be then paid, he will enter a judgment against Gray and Smith for the amount. None of these judgments, however, will be entered until Starliper files in court the stock, which will be held in the cause by the chancellor until all the payments are made by Gray and Smith, and then the stock will be delivered over to the said Gray and Smith. On the filing of the stock in court Starliper will be entitled to an execution on the two amounts adjudged in his favor and on the 27th of March, 1917, the remaining sum due him for his stock.

A decree for all the costs of the cause will be entered against Gray and Smith, both for this court and the court below.